**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DREAMTEX, INC. AND EVAN YOUNG,<br><br>                             Petitioners,<br>   v.<br><br>ALVA ADVANCE, LLC<br><br>                          Respondent. | Civil Action No.:  1:22-cv-9248<br><br>**PETITION TO VACATE**<br>**ARBITRATION AWARD** |

Petitioners Dreamtex, Inc. ("Dreamtex") and Evan Young (collectively "Petitioners") respectfully submit, by and through their undersigned counsel, this Petition for an order, pursuant to 9 U.S.C. § 10, to vacate an arbitration award delivered on August 1, 2022 (the "Award") against Petitioners and in favor of Respondent Alva Advance, LLC ("Alva").

## NATURE OF PETITION

1.      Respondent Alva is a merchant cash advance ("MCA") company that obtained a $483,783.75 arbitration award against Petitioners Dreamtex and its individual owner, Evan Young, through Mediation and Civil Arbitration, Inc. ("MCA, Inc.").

2.      MCA, Inc. is a judgment manufacturing mill for the predatory MCA industry.

3.      In October 2022 alone, at least ninety-four (94) petitions were filed in New York State Court to confirm sham arbitration awards issued by MCA, Inc.—nearly all of them were filed by a single MCA company—The LCF Group ("LCF").[1]

4.      In the past year alone, that very same MCA company, LCF, has filed nearly one thousand (1,000) petitions in New York State Court seeking to confirm similar sham arbitration awards issued by MCA, Inc.  Almost eight hundred (800) of those were issued by the same so-called arbitrator, Andrew Sachs, Esq.[2]

---

[1] *See* Declaration of Shane R. Heskin, dated October 27, 2022, Ex. 1.
[2] *See id.*, Ex. 2.

5.      In addition to the nearly 1,000 arbitration awards issued to LCF, MCA, Inc. also issued approximately 450 to Last Chance Funding (the prior name of The LCF Group) between 2020 and 2021.[3]

6.      The so-called arbitrator at issue here, Ira David, issued at least ten (10) sham arbitration awards in LCF's favor in just the past month.[4]

7.      Petitioners now bring this motion to vacate in response to the unlawful and fraudulent scheme employed by MCA, Inc. and the MCA industry to prey on our nation's small businesses and their individual owners.

8.      In November 2018, Bloomberg News issued a series of groundbreaking articles exposing the MCA industry's abuse of New York's confession of judgment statute, identifying more than 25,000 confessions of judgment obtained against small businesses all across the country.[5]  In direct response, in August 2019, the New York State Legislature banned the use of confessions of judgment on out-of-state debtors—like Petitioners here. The United States Congress also took notice convening a special hearing on June 26, 2019, titled "Crushed by Confessions of Judgment:  The Small Business Story."[6]

9.      Undeterred, the predatory MCA industry has devised a new tactic to terrorize out-of-state small business victims, once again abusing New York's Court System.

10.      Rather than file an action in state court or use a legitimate arbitral forum, like AAA or JAMS, MCA companies are erecting sham arbitration organizations to give courts the appearance that they are pursuing a legitimate arbitration proceeding, and then simultaneously filing ex parte orders to show cause seeking to freeze the out-of-state debtor's bank accounts.

---

[3] *See id.*, ¶ 21.
[4] *See id.*, Ex. 3.
[5] https://www.bloomberg.com/confessions-of-judgment
[6] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=9

11.     In support, the MCA company, like Respondent here, not only conspires with the sham arbitration service, but it also knowingly misrepresents the law to the state courts in order to freeze their victim's out-of-state bank accounts.  Despite knowing that injunctive relief is not available for purely money damages, the MCA company falsely represents to the state courts that the *ex parte* relief they seek is "routinely granted."  The MCA companies make these knowingly false representations even though they are aware that numerous state courts "routinely" deny the requested relief, and that New York appellate courts "routinely" vacate the relief requested when lower state courts mistakenly rely upon the false representations made by the MCA company.

12.     In 2022 alone, the Respondent's counsel, The Gene Rosen Law Firm, has filed no less twenty-two Article 75 proceedings seeking to freeze the bank accounts of out-of-state debtors—*ex parte.*[7]

13.     Even worse, the MCA industry and Respondent have conspired with two sham arbitral forums that are funded primarily, if not entirely, by the MCA industry to procure sham arbitration awards without affording their victims' due process.

14.     The sham arbitration rules are purposely designed to ensure that quick awards are issued before the small business victim has any opportunity to obtain discovery, present evidence, or object to the appointed arbitrator.

15.     To be sure, the time to respond to the arbitration demand is just seven (7) days, and service of the demand is deemed effective upon e-mail. And even if an out-of-state victim is able to secure New York counsel to respond to the demand within seven (7) days, the sham arbitrators construe the rules to require the respondent to ***submit all evidence in opposition to the demand within those same seven days.***  In other words, not only must the respondent file an answer withing

---

[7] *See* Heskin Decl., Ex. 4.

(7) seven days, but it must also present all evidence, case law, and supporting briefing within seven (7) days—***before an arbitrator is even appointed***.

16.     The sham nature of this process is so outrageous that at least one court refused to confirm one of these awards ***sua sponte*** because it was so irrational on its face.[8]

17.     The arbitration award here is likewise irrational on its face.  The arbitrator awarded Respondent $483,783.75 on a net principal balance of $213,421.  Of that amount, the arbitrator awarded Respondent $96,452.75 in attorney's fees for the mere filing of a demand.[9]

18.     The procedures employed by MCA, Inc. brazenly violate both federal and state law.

19.     N.Y. CPLR 7506 provides: (a) Before hearing any testimony, an arbitrator shall be sworn to hear and decide the controversy faithfully and fairly by an officer authorized to administer an oath; and (b) The arbitrator shall appoint a time and place for the hearing and notify the parties in writing personally or by registered or certified mail not less than eight days before the hearing.

20.     Instead of complying with New York law and the due process required by the United States Constitution, MCA, Inc's sham arbitration rules consider all evidence submitted and closed within seven (7) days of email receipt of the arbitration demand.  All before an arbitrator is even appointed.[10]

21.     The facts of this case underscore the unconstitutionality and abuse of these intentionally lopsided rules.  Here, Petitioner requested a mere fourteen-day extension of time to respond.  Neither the arbitral forum, nor the underlying Claimant responded, forcing Petitioners to file an answer to protect their rights.

---

[8] *See id*., Ex. 5.
[9] *See id.*, Ex. 6 ("Final Arbitration Award").
[10] *See id.,* Ex. 7 (MCA, Inc. Arbitration Rules and Procedures).

22.     In their answer, Petitioners expressly objected to the arbitral forum and demanded disclosures from the arbitral forum.  In fact, Petitioners instead agreed to arbitrate before a legitimate, neutral arbitral forum, such as JAMS or AAA.[11]

23.     Despite these objections, the sham arbitral forum, MCA, Inc., deemed the extension request moot, unilaterally proceeded with the appointment of an arbitrator, and issued an award without any further notice to the parties.  Notably, no disclosures were made before issuing the award (despite repeated demands for disclosures),[12] leaving the parties with no opportunity to object prior to the issuance of the award.

24.     Moreover, even after the award, the arbitrator gave literally no disclosures in which to allow the parties to investigate conflicts.  Indeed, to this day, Petitioners do not know the identity of the arbitrator or his credentials.  All Petitioners know is that his name is supposedly "Ira David, Esq."  But he certainly is not a New York lawyer.[13]

25.     Simply put, the arbitral forum is a complete and utter sham, and the arbitration award must be vacated based on fraud, misconduct, bias and deprivation of due process.

## THE PARTIES

26.     Petitioner Dreamtex Inc. is a corporation organized under the laws of the State of Florida and has its principal place of business in Boca Raton, Florida.

27.     Petitioner Evan Young is a citizen and resident of the State of Florida.

28.     Respondent Alva Advance LLC is a limited liability company organized under the laws of New York with its principal place of business in Brooklyn, New York.

---

[11] *See id*, Ex. 8.
[12] *See id*, Ex. 9.
[13] *See id*, Ex. 10.

-5-

29.     All members of Alva Advance LLC, Alan Levine and Jared Leff, are residents and citizens of the State of New York.[14]

## JURISDICTION AND VENUE

30.     This Court has diversity jurisdiction to hear this Action and adjudicate the claims asserted herein pursuant to 28 U.S.C. § 1332 because diversity exists between the parties and the amount in controversy exceeds $75,000.

31.     Venue is proper in this District pursuant to 9 U.S.C. § 10 and 28 U.S.C. § 1391 as the arbitration Award was made in this judicial district, in New York, New York.

## STATEMENT OF FACTS

**A.     Procedural History**

32.     This dispute involves two high-interest loans entered into by Dreamtex on September 2, 2021, and October 1, 2021.

33.     The first loan, disguised as a sale of receivables, was an advance of $93,000 with a payback of $150,000.  The daily payment was $1,250 per day, disguised as 13.2% of Dreamtex's daily receivables.[15]

34.     The second loan, also disguised as a sale of receivables, was an advance of $190,000 with a payback of $300,000.  The daily payment was $2,727 per day, disguised as 9% of Dreamtex's daily receivables.[16]

35.     The sham nature of these disguised daily payments demonstrate that the daily payment is tied to the size of the loan, not the percentage of receivables purportedly purchased. Simple math demonstrates that the interest rates on the loans were 127% and 131%.

---

[14] *See id.*, Exs.11 and 12.
[15] *See* Declaration of Evan Young, dated October 24, 2022, Ex. 1.
[16] *See id.*

36.     Despite the sham labels on the face of these agreements, they are criminally usurious loans, which are void ab initio.  *See Adar Bays, LLC v. GeneSYS ID Inc.*, 37 N.Y.3d 320, 334 (2021) (holding that criminally usurious loans are unenforceable and void *ab initio*).

37.     Due to the oppressive interest charged and the aggressive fixed daily payments required under these loans, Dreamtex was unable to make the daily payments and the daily debits failed due to insufficient funds.[17]

38.     As a result of these failed payments, Respondent filed a demand for arbitration with MCA, Inc. on or around May 9, 2022.  At the same time, Respondent also filed an Article 75 Proceeding in New York State Court, and sought and obtained an *ex parte* preliminary injunction freezing Respondent Dreamtex's out-of-state bank accounts.

39.     In support, Respondents falsely represented to the state trial court that the relief sought was "routinely" granted.  After its hand was caught in the cookie jar, Respondent agreed to vacate the restraint on Respondent's out-of-state bank accounts.  Incredibly, Respondent and its counsel had previously had a similar *ex parte* injunction vacated by the New York Appellate Division, Second Department, and had been placed on notice that its conduct was unlawful.  A motion for sanctions is pending.[18]

40.     The arbitration demand was served via email and certified U.S. Mail on May 9, 2022.[19]  On May 16, 2022, on the same day counsel was retained, Respondents requested a fourteen-day extension to respond.[20]

---

[17] *See id.*, ¶¶ 14-16.
[18] *See* Heskin Decl., Ex 13.
[19] *See* Young Decl., ¶ 6, Ex.1.
[20] *See* Heskin Decl., Ex. 14.

41.    Having received no response, Respondents filed an answer to preserve their rights and prevent a default judgment from being entered.  In doing so, Respondents expressly objected to the arbitral forum and demanded disclosures.[21]

42.    On May 18, 2022, MCA Inc. sent an email claiming that the request for an extension was deemed moot based on the filing of the answer.  Once again, Petitioners objected to the arbitral forum, demanded disclosures and a list of panel members.  Petitioners also agreed to arbitrate before a neutral, unbiased arbitral forum, such as JAMS or AAA.[22]

43.    On July 1, 2022, MCA, Inc. unilaterally appointed Ira David, Esq. as arbitrator without any input from the parties and without any disclosures whatsoever.

44.    Petitioners immediately objected to the appointment and demanded disclosures.[23]

45.    In response, MCA, Inc. stated:

> The Arbitrator has been assigned pursuant to the RapidRuling Rules, that the parties agreed to, created to comply with both the Federal Arbitration Act and New York Civil Practice Laws and Rules. ***Further disclosures will be delivered with the Arbitrator's Oath prior to the Arbitrator taking testimony on the Claim***. After that disclosure, or at any time a conflict arises thereafter, you may still object for cause by filing a motion at the RapidRuling eFile Portal.[24]

46.    The next communication received from MCA, Inc. was, on August 1, 2022, attaching a Final Award, dated July 28, 2022.[25]

**B.    Respondent Utilizes a Sham Arbitral Forum**

47.    Despite the New York Legislature enacting legislation to curb the abuses of the MCA industry on out-of-state borrowers, the MCA industry has since devised a scheme to evade

---

[21] *See* Young Decl., ¶ 7, Ex.2.
[22] *See id*, Exhibit 2.
[23] *See* Heskin Decl., Ex. 15.
[24] *See* Heskin Decl., Ex. 9.
[25] *See* Heskin Decl., Ex. 6.

it.  With respect to out-of-state borrowers, MCA companies, like Respondent, have conspired with a law firm to pose as an arbitral forum to quickly confess judgments against out-of-state debtors. In just the past eleven months, one of these MCA companies, The LCF Group, has filed over 975 CPLR Article 75 proceedings to enforce sham arbitrations awards from MCA Inc.

48.     The sham arrangement is as blatant as it gets.  The administrator and founder of MCA Inc. is Zachary Meyer of Sutton, Sachs & Meyer PLLC:

**PLEASE READ BEFORE PROCEEDING: To begin proceedings, please send a copy of this demand and the Arbitration Agreement, along with supporting documentation to Mediation & Civil Arbitration Inc. at Zachary@mcarbitration.org,**

49.     In nearly 800 arbitration awards obtained by LCF, the so-called impartial arbitrator was Andrew Sachs, Esq.  Andrew Sachs is a partner at Sutton, Sachs & Meyer PLLC.  The filing fee alone for each arbitration is a minimum of $200.  That equates to at least $160,000 in just filing fees alone paid by LCF to MCA Inc.

50.     Prior to figuring out it was a bad idea, MCA Inc. used the following moniker:



51.     In addition to the blatant bias of having the exact same arbitrator issue nearly 800 awards in just one MCA company's favor, the arbitral rules and procedures are purposefully designed to ensure quick judgments in violation of the merchant's due process rights.

52.     In advertising its services directly on DeBanked, a notable forum of the MCA industry, MCA Inc. describes its process as below:[26]

---

[26] *See id.*, Ex. 16, DeBanked, *Deal Gone Bad?  Next Stop Arbitration*, dated June 20, 2022, by Sean Murray.

1. Submit Your Dispute
2. Wait For Opposing Party To Respond
3. Arbitrator Reviews Submissions
4. Receive An Arbitration Award

53.     These arbitration procedures blatantly rob merchants and their individual owners

of their constitutional due process rights.  They also violate New York law.

54.     CPLR 7506 provides:

(a) Oath of arbitrator. Before hearing any testimony, an arbitrator shall be sworn to hear and decide the controversy faithfully and fairly by an officer authorized to administer an oath.

(b) Time and place. The arbitrator shall appoint a time and place for the hearing and notify the parties in writing personally or by registered or certified mail not less than eight days before the hearing.  The arbitrator may adjourn or postpone the hearing. The court, upon application of any party, may direct the arbitrator to proceed promptly with the hearing and determination of the controversy.

(c)  Evidence.  The parties are entitled to be heard, to present evidence and to cross-examine witnesses. Notwithstanding the failure of a party duly notified to appear, the arbitrator may hear and determine the controversy upon the evidence produced.

(d)   Representation by attorney.   A party has the right to be represented by an attorney and may claim such right at any time as to any part of the arbitration or hearings which have not taken place. This right may not be waived. If a party is represented by an attorney, papers to be served on the party shall be served upon his attorney.

(e)  Determination by majority. The hearing shall be conducted by all the arbitrators, but a majority may determine any question and render an award.

(f) Waiver. Except as provided in subdivision (d), a requirement of this section may be waived by written consent of the parties and it is waived if the parties continue with the arbitration without objection.

-10-

55.     CPLR 7503(c) further provides a respondent at least 20 days object to arbitration on the basis of fraud or other means:

> A party may serve upon another party a demand for arbitration or a notice of intention to arbitrate, specifying the agreement pursuant to which arbitration is sought and the name and address of the party serving the notice, or of an officer or agent thereof if such party is an association or corporation, and stating that unless the party served applies to stay the arbitration within twenty days after such service he shall thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court the bar of a limitation of time.

56.     The sham arbitration rules and procedures employed by MCA, Inc. blatantly violate these rules.

57.     First, the time to respond is just seven days.  Thus, in addition to violating the 20-day time to object to an arbitration pursuant to CPLR 7503(c), it is literally impossible for the arbitrator to comply with the eight-day notice requirement of CPLR 7506(a) because all evidence must be presented within 7 days.  Also, to state the obvious, clearly an arbitrator cannot provide 8-days' notice of the hearing if the time to submit all evidence is just 7 days.

58.     Second, service is deemed complete upon the sending of just an email.

59.     Third, even if a merchant does timely serve an answer denying liability, an arbitrator is assigned without any input from the parties and an award is issued without notice of a hearing, or the opportunity to take discovery.

60.     Fourth, the arbitrator is hand selected by Zachary Meyer, and there is no opportunity to object to the appointment of the arbitrator selected until after an award has been rendered.

61.     Fifth, there are absolutely no disclosures by the arbitrator before or after the arbitration award—even if demanded.  Rather, the arbitrator self-certifies that he has no conflict despite no mutual exchange of potential conflicts—**after** the award has been rendered.

62.     Sixth, in rendering the more than 975 awards to a single MCA company, LCF, the sham arbitrator has cited CPLR 7508, which is a blatant end run around the legislative ban on out-of-state confessions of judgments.  In doing so, the sham arbitrator is falsely representing that the award is warranted under CPLR 7508 based on a non-existent Verified Statement by the Respondent.  *See* CPLR 7508 ("The award shall be based upon a statement, verified by each party, containing an authorization to make the award, the sum of the award or the method of ascertaining it, and the facts constituting the liability.").

63.     Seventh, there is no opportunity to present witnesses or cross-examine witnesses.

## STANDARD

64.     A court may vacate an arbitration award where: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators, or either of them; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any misbehavior by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.  *See* 9 U.S.C. § 10(a).

### A.     The Award Must be Vacated Based on the Misconduct of the Arbitral Forum in Depriving Petitioners of Due Process.

65.     All parties in an arbitration proceeding are entitled to notice and an opportunity to be heard.  Thus, a district court may vacate an arbitration award when the evidentiary process deprives a party of a fair hearing.

66.     The lack of due process in Respondent securing the Award is not even a close call.

67.     Here, the arbitration demand was served by email and certified mail and, as a direct result, the response to the arbitration demand was due just one day after counsel was retained.

68.     In an abundance of caution, Petitioners filed an answer expressly objecting to the arbitral forum and demanding an opportunity to take discovery, including demanding disclosures regarding the fundamental fairness and impartiality of the arbitral forum.

69.     Not only did the arbitral forum refuse to provide disclosures or discovery, but it went ahead and appointed an arbitrator without any input from Petitioners and issued a Final Award without providing any opportunity to present evidence or argument.

70.     Instead, the arbitrator decided the entire arbitration proceeding on the sole basis of an answer that was required to be filed within seven days of the alleged service.

71.     This procedural requirement alone not only violates fundamental due process, but it also violates the express requirements of the N.Y. CPLR, which requires an arbitrator to provide at least eight-days' notice of the hearing, as well as provide the right to cross examine witnesses and present evidence.

72.     At no point did Petitioners waive these rights.  Rather, Petitioners consistently objected to the arbitral forum and the failure to provide disclosures.[27]

73.     Incredibly, MCA, Inc. specifically represented to Petitioners that "disclosures will be delivered with the Arbitrator's Oath prior to the Arbitrator taking testimony on the Claim."[28]

74.     Despite this express representation, the arbitrator did not provide his oath until the Petitioners' received a copy of the Final Award.  Nor did the arbitrator provide any disclosures in

---

[27] *See* Heskin Decl., Ex. 8.
[28] *See* Heskin Decl,  Ex. 9.

which to object to the arbitrator based on prior relationships, conflicts or background—*before* issuing the Final Award.

75.     In fact, to this day, Petitioners have no idea who the arbitrator is, what his work history is, or the extent of his prior relationship with the Respondent or its counsel.

76.     Rather, all that was provided was a self-serving assertion that the arbitrator has no conflicts—*after* issuing the Final Award.  Surely, an arbitrator cannot evade a challenge based on bias due to his own refusal to provide detailed disclosures.

77.     Even without providing disclosures, a search of the New York public dockets reveals that the arbitrator here has issued at least 10 arbitration awards in favor of just one MCA company alone—*within the past month*.[29]

78.     This procedural gamesmanship is yet further evidence of the sham nature of the arbitral forum, and its utter lack of due process and good faith.

**B.     The Award Must Be Vacated Based on Evident Partiality**

79.     An arbitration award may be vacated if there is an "evident partiality" of the arbitrator.  *See* 9 U.S.C. § 10(a)(2). Evident partiality means a situation where "a reasonable person would have to conclude that an arbitrator was partial to one party to an arbitration."  *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 626 (6th Cir. 2002); *ANR Coal Co. v. Cogentrix of N.C., Inc.*, 173 F.3d 493, 500-01 (4th Cir. 1999); *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984); *Al Harbi v. Citibank, N.A.*, 318 U.S. App. D.C. 114, 85 F.3d 680, 683 (D.C. Cir. 1996) ("The claimant must establish specific facts that indicate improper motives on the part of an arbitrator."); *Montez v. Prudential Secs., Inc.*, 260 F.3d 980, 983 (8th Cir. 2001) (collecting cases on "evident partiality").

---

[29] *See* Heskin Decl.,  Ex. 3.

80.    Here, Petitioners had absolutely zero opportunity to object to the appointment of the arbitrator **before** the issuance of the Final Award.  In fact, Petitioners did not even receive the arbitrator's purported disclosures until **after** the issuance of the Final Award.  That is not how disclosures are supposed to work.

81.    Rather, an arbitrator must provide disclosures **before** the arbitration proceeding commences, and certainly **before** the issuance of a final award.

82.    To this day, the arbitrator has provided no meaningful disclosures at all, let alone **prior to issuing the Final Award.**

83.    Even in the arbitrator's bare bones, after-the-fact disclosures, he reveals an objectionable relationship with Respondent.  To wit, the arbitrator admits in his post-award disclosure that he "may have previously been selected to arbitrate similar disputes for the same or similar claimant in this arbitration."[30]  Yet, he fails to identify the number of prior arbitrations, the results of those arbitrations, or the amount of fees has been paid in those prior arbitrations by Respondent.

84.    Again, a review of just the state court dockets reveals the absurdity of the unfair bias of the arbitral forum.  In the span of less than one year, one MCA company alone, LCF, has sought to confirm at least 975 arbitration awards issued by MCA, Inc.—with nearly 800 of those awards issued by the very same arbitrator.

85.    Indeed, the awards issued by MCA, Inc. are so blatantly outrageous that at least one state court has refused to confirm an award—s*ua sponte*—because it was in manifest disregard of the law.[31]

---

[30] *See* Heskin Decl,, Ex. 6,¶ 5.
[31] *See* Heskin Decl, Ex. *5*.

86.     In addition to the number of awards entered in favor of MCA companies in just the last year alone—by just one MCA company, the unfair bias is further demonstrated by MCA Inc.'s own advertising in MCA industry publications, promising quick, simple step awards.

87.     Finally, a search of the New York dockets reveals that Respondent here has also used the same arbitrator who issued nearly 800 awards in favor of MCAs—Andrew Sachs, Esq. Due to the arbitrator's failure here to provide any meaningful disclosures before or after the Final Award, the number of awards issued by this particular arbitrator, Ira David, is totally unknown—but it is at least in excess of ten—in the span of just one month.

### C.     The Award Must be Vacated based on Fraud and Misconduct

88.     The FAA expressly permits a court to vacate an arbitration award where "the award was procured by corruption, fraud, or undue means."  9 U.S.C. § 10(a); *see also Agarwal v. Agarwal*, 775 F. Supp. 588, 589 (S.D.N.Y. 1991) (noting misconduct occurs "where there is proof of either bad faith or gross error on the part of the arbitrator.").

89.     As specifically alleged in Petitioner's Answer, the MCA industry and Respondent have conspired with MCA, Inc. to provide sham arbitration services as a means to circumvent New York's ban on confessions of judgments against out-of-state debtors.[32]

90.     As evidence of this conspiracy, the form MCA agreements used by Respondent only permit the use of two arbitral forums, MCA, Inc. and Arbitration Services, Inc.—both of which are used primarily, if not exclusively, by the MCA industry.

91.     The sheer number of awards issued by these arbitral forums also lends further proof that Respondents have conspired with MCA, Inc. to provide sham services.  In response to these allegations and demands for disclosures and discovery, MCA, Inc. refused to provide any

---

[32] *See* Young Decl., ¶ 4, Ex.2.

disclosures at all, let alone discovery into the internal and external communications with Respondent and the MCA industry.  Instead, it rushed to issue a Final Award without any notice whatsoever, and without any opportunity to be heard.

92.     At a minimum, and as a matter of fundamental fairness, this Court should permit discovery on the relationship between Respondent, MCA, Inc. and the MCA industry in general. *See Sanko S.S. Co. v. Cook Industries, Inc*., 495 F.2d 1260, 1263 (2d Cir. 1973) ("These discrepancies require that this case be remanded so that an evidentiary hearing may be held and the full extent and nature of the relationships at issue may be ascertained. After the facts of the relationship between Cook and Dreyfus or Besman and O'Brien are thoroughly aired, the district court will be in a better position to follow the dictates of *Commonwealth Coatings v. Continental Cas. Co.*, 393 U.S. 145, 21 L. Ed. 2d 301, 89 S. Ct. 337 (1968)); *see also Frere v. Orthofix, Inc.,* 2000 WL 1789641 (S.D.N.Y. Dec. 4, 2000) (discussing standard for discovery on motion to vacate arbitration award) (citing *Sidarma Societa Italiana Armamento, SPA, Venice v. Holt Marine Inds., Inc.*, 515 F. Supp. 1302, 1309 (S.D.N.Y. 1981), *aff'd* 681 F.2d 802 (2d Cir. 1981)).

### D.     The Award Must Be Vacated Based On Manifest Disregard Of The Law

93.     The United States Supreme Court in *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), ruled that that section 10 of the FAA provides the exclusive route for expedited judicial vacatur of an arbitral award under the federal statutory scheme.  The Court in *Hall Street* left open whether "manifest disregard" remains a valid ground for vacating an arbitral award under the FAA.  *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 130 S.Ct. 1758, 1768 n. 3, 176 L.Ed.2d 605 (2010) ("We do not decide whether manifest disregard survives our decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, as an

independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U.S.C. § 10.").

94.     The Second Circuit, however, continues to recognize "manifest disregard of the law."  *See STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC,* 648 F.3d 68, 78 (2d Cir. 2011); *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010) ("This Court, in the wake of *Hall Street Associates*, "concluded that manifest disregard remains a valid ground for vacating arbitration awards."); *Schwartz v. Merrill Lynch & Co.,* 665 F.3d 444, 451–52 (2d Cir. 2011); *see also Sutter v. Oxford Health Plans LLC,* 675 F.3d 215, 220, 220 n. 2 (3d Cir.2012); *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 665 (9th Cir. 2012).

95.     The totality of the unfair bias evidenced above explains the manifest disregard of the law by the arbitrator.  The most outrageous and brazen manifest disregard of the law is with respect to the attorney's fee award and the finding of liability on the personal guarantee.

> i.     *Arbitrator Disregarded New York Law Concerning Awarding Attorneys' Fees*

96.     Despite the absences of any evidentiary record whatsoever, the arbitrator awarded Respondent $96,452.75 in attorney's fees for the mere filing of a demand.  The award was supported by literally no evidence whatsoever and is spun out of whole cloth.

97.     On the face of the contract, and in the demand, Respondent is only entitled to reasonable attorney's fees.  Although the unconscionable contract of adhesion also says that the fees may include a contingent fee, none is identified anywhere in the contract or in the record. Further, there was no affidavit submitted attesting to the reasonableness of the fees incurred. Rather, all that was submitted was a number picked randomly out of thin air.

98.     Nevertheless, the arbitrator accepted the attorney's fees arbitrarily demanded.  That is not the law.  *See*, *e.g.*, *Baehre v. Rochester Dental Prosthetics, Inc.*, 112 Misc. 2d 270 (N.Y.

Sup. Ct. 1982) (court vacated a confession of judgment because, *inter alia*, the attorney's affidavit supporting the request for confession of judgment included a charge for "legal services" without any additional description); *Headquarters Rest Corp. v. Reliance Vending Co.*, 133 A.D.2d 444, 446 (2d Dept. 1987) (requiring a hearing to ascertain validity legal fees because there was no evidence of legal work performed.); *Franklin Nat'l Bank v. Wall St. Commercial Corp.*, 40 Misc. 2d 1003, 1004 (N.Y. Sup. Ct. 1963) (Although "[t]he insertion in a note of a provision for the payment of attorneys' fees is enforceable . . . the stipulated amount inserted in the instrument must be reasonable and undisputed to warrant summary relief."); *First Bank of East Islip v. Brower,* 42 NY 2d 471, 474 (1977) (where a provision for payment of attorneys' fees is expressed as a percentage of the amount due on the note, a party "is entitled to recover attorney fees of [that percentage] only if it demonstrates that the quality and quantity of the legal services rendered were such to warrant, on a quantum meruit basis, that full percentage.").

99.     Respondent submitted no evidence to support the reasonableness of the attorneys' fees it obtained in the Final Award, nor any evidence that it actually paid its attorneys $96,452.75 in fees.  The attorneys' fees added to the Final Award are an invalid penalty that cannot be sustained as a matter of law and public policy.

100.    The amount is also unconscionable as a matter of law because it provides Respondents with $96,452.75 in attorney's fees—for simply filing an arbitration demand devoid of any evidence.

ii.     *Arbitrator Disregarded New York Law In Finding Petitioners Liable*

101.    In finding that the MCA agreements were not criminally usurious loans because the agreements were sufficiently risky, the arbitrator emphasized that the personal guarantee was not

enforceable due to a slowdown in business or in the event of business failure.  Yet, that is exactly what the arbitrator did.

102.     The personal guarantee on its face is only triggered upon a breach of the representations, warranties or covenants.   The arbitrator cites no representation, warranty or covenant that was breached.[33]

103.     Instead, the arbitrator claimed that the personal guarantee was triggered because the individual owner intentionally interfered with Respondent's collection of receivables.

104.     The only support in the record is a copy of the banking records.  But those records directly refute the arbitrator's finding.

105.     Indeed, a simple Google search would have revealed that the code reflected by Respondent's own submission, R01, was for insufficient funds.[34]

106.     In fact, a review of the same arbitrator's own award reveals that he knows the distinction between these codes and specifically that code 01 means insufficient funds.[35]

107.     Although the arbitrator dismisses the denials contained in the Petitioners' Answer that it did anything to interfere with the collection of Respondents' receivables, the MCA agreement itself provides that it is an event of default only if the bank returns a debit for codes 08, 10, or 29:

> (16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide ALVA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to accountant@alvaadvance.com; or

108.     The bank transaction records submitted show just the opposite:

---

[33] *See* Young Decl., Ex.1 – Ex. A Paragraph G1.
[34] https://blog.payjunction.com/ach-reject-codes; Heskin Decl, Ex. 17
[35] *See* Heskin Decl., Ex.18 Paragraph 8.

| 10/29/2021 | Dreamtex Inc | $ | 1,875.00 | Failed | R01 | $ | 114,375.00 |
| 11/1/2021 | Dreamtex Inc | $ | 1,875.00 | Failed | R01 | $ | 114,375.00 |

109.    In addition to finding personal liability, the arbitrator completely ignored the overwhelming number of cases within this District holding that the MCA agreements at issue are criminally usurious loans, and that intent is a question of fact that must be subject to a fact intensive inauiry.  *See*, *e.g.*, *Lateral Recovery, LLC v. Capital Merch. Servs., LLC*, 2022 U.S. Dist. LEXIS 181044, *99 (S.D.N.Y. Sept. 30, 2022) (finding agreement to be a loan where it places all risk of nonpayment on the purported seller) (J. Liman); *New Y-Capp v. Arch Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 180309 (S.D.N.Y. Sept. 30, 2022) (J. Carter) (same); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (JSR), 2022 WL 2297768 (S.D.N.Y. June 27, 2022) (J. Rakoff) (upholding RICO claims for unlawful debt collection under purported sale of receivables); *Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 20-cv-5120 (LJL), 2021 WL 1987320 (S.D.N.Y. May 18, 2021) (J. Liman) (same); *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 20-cv-5120 (LJL), 2022 WL 1997207 (S.D.N.Y. June 6, 2022) (granting summary judgment on RICO claims regarding purported sale of receivables); *Fleetwood Servs. LLC v. Ram Capital Funding*, 20-cv-5120 (LJL), 2022 WL 3536128 (S.D.N.Y. Aug. 17, 2022) (awarding treble damages under RICO statute); *Lateral Recovery v. Queen Funding, LLC* 21-cv-9607 (LGS), 2022 WL 2829913 (S.D.N.Y. July 20, 2022) (J. Schofield) (upholding RICO claims for unlawful collection of debt).

110.    Instead of addressing any of the above cases, the arbitrator used a stock legal analysis that is likely used in everyone of his MCA cases.  Of course, no disclosures or discovery was permitted to obtain a copy of these prior awards.

111.    Simply put, the Final Award is devoid of merit, was obtained by fraud, and should be vacated for blatant, unfair bias.

**WHEREFORE**, Petitioners respectfully request the following:

a.      An Order and Judgment pursuant to 9 U.S.C. § 10, the FAA, vacating the arbitration Award against Petitioners dated August 1, 2022;

b.      An Order remanding the Arbitration to a newly appointed neutral arbitration organization, such as AAA or JAMS; and

c.      Such other and further relief as this Court deems just and proper.

Dated:  October 27, 2022

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By:     Shane R. Heskin
        Alex D. Corey
        7 Times Square, STE 29
        New York, NY 10036
        heskins@whiteandwilliams.com

        *Attorneys for Petitioners*

-22-